IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MOHAMED M. SALIM,                    )
                                     )
          Plaintiff,                 )
                                     )
     v.                              )          No. 1:15-cv-468 (LMB/IDD)
                                     )
EDWARD DAHLBERG,                     )
                                     )
          Defendant.                 )

<u>MEMORANDUM OPINION</u>

Before the Court is the Defendant's Rule 59 Motion, in which he argues that he should be

granted a new trial because the court lacked jurisdiction to hear and decide this civil action.

Defendant argues in the alternative that even if the court had jurisdiction over the action, it erred

in exercising its discretion to maintain supplemental jurisdiction over the state law claims after

the single federal claim was dismissed.[1] Defendant also argues that the amount of damages

awarded by the jury is against the weight of the evidence, that the verdict violated the

defendant's First Amendment right to free expression, and that two evidentiary rulings made by

the Court were erroneous. Plaintiff, in a brief opposition, argues that defendant's jurisdictional

arguments are meritless, that defendant has waived or is estopped from raising any First

Amendment defense, and that the Court's evidentiary rulings do not provide a basis for a new

trial. The parties also dispute whether the size of the verdict demonstrates that the jury acted out

of passion or prejudice.

---

[1] As plaintiff points out, requesting a new trial while at the same time arguing that the court
lacked jurisdiction to hear this civil action is an inconsistent argument.

I.   BACKGROUND

On April 9, 2015, plaintiff Mohamed M. Salim ("Salim" or "plaintiff"), a Somali-born

Muslim who is a naturalized United States citizen, filed a complaint against defendant Edward

Dahlberg ("Dahlberg" or "defendant"), alleging that Dahlberg, a white Christian born in the

United States, had violated Salim's civil rights and had assaulted and battered him. See Compl.

[Dkt. No. 1], April 9, 2015. Specifically, Salim, who was working as a taxi driver, claimed that

after he picked Dahlberg up from a Northern Virginia country club shortly after midnight on

April 26, 2014, Dahlberg engaged in an alcohol-fueled rant against Muslims and Arabs that

culminated in Dahlberg punching Salim multiple times. Salim recorded a portion of their

interaction using his cellphone, and the complaint attached a copy of the transcript of that

recording, which showed that Dahlberg made multiple comments that associated Muslims with

terrorism. In part, Dahlberg stated "If you're a Muslim, you're a f…ing jihadist;" demanded that

Salim "denounce those f…ing assholes that flew jets into the World Trade Center;" declared that

he would "slice your f…ing throat right now" if "you're a f…ing Muslim flying jets into the

World Trade Center;" and called Salim "a f…ing Muslim piece of f…ing sh*t." Compl., Ex A.

[Dkt. No. 1-1], Recording Tr. 3:19-20, 6:6-7:16.

In Count I of his five-count complaint, Salim alleged that Dahlberg took these actions on

the basis of Salim's race and religion and that Dahlberg had therefore violated 42 U.S.C. § 1981,

which provides that all persons in the United States "shall have the same right…to make and

enforce contracts." In Count II, Salim raised a claim under Va. Code Ann. § 8.01-42.1, which

provides a cause of action to "any person who is subjected to acts of (i) intimidation or

harassment or (ii) violence directed against his person…where such acts are motivated by racial,

religious, or ethnic animosity." Counts III, IV, and V of the complaint respectively alleged that

2

Dahlberg had committed an assault and a battery against Salim and had intentionally inflicted emotional distress on Salim. Because both parties were domiciled in Virginia, making them non-diverse, the only basis for the court's jurisdiction was the federal question raised in Count I.

The defendant's answer raised a number of defenses, including failure to state a claim under 42 U.S.C. § 1981 and lack of subject-matter jurisdiction. Answer [Dkt. No. 6] 1, May 4, 2015. In conjunction with his answer, Dahlberg filed a Motion to Dismiss the Complaint Pursuant to Rule 12(b)(1) and (6) [Dkt. No. 4], May 4, 2015, arguing in part that the § 1981 claim should be dismissed because the provision prohibits discrimination only on the basis of race and not on the basis of religion. That motion also argued that the state law claims should be dismissed pursuant to 28 U.S.C. § 1367(c) because the only basis for the Court's jurisdiction over those claims was through its supplemental jurisdiction based on Salim's "defective claim" under § 1981. Mem. Supporting Def.'s Mot. to Dismiss Pursuant to Rule 12(b)(1) and Rule 12(b)(6) [Dkt. No. 5] ("Mot. to Dismiss Br.") 2, May 4, 2015. The defendant argued that the parties' conversation during the cab ride focused on religion and terrorism and contained no references to Arabs or to Salim's race, meaning that there was no basis for the § 1981 claim. Id. In opposing the motion to dismiss, the plaintiff argued that race discrimination and religious discrimination may overlap, particularly in the case of individuals coming from Arab nations where the majority of the population is Muslim and especially in the wake of the September 11, 2001 terrorist attacks ("9/11"). Pl.'s Mem. in Opp'n to Mot. to Dismiss [Dkt. No. 10] ("Mot. to Dismiss Opp'n") 2-3, May 14, 2015.

The Court granted the defendant's motion to dismiss the § 1981 claim, but ordered that the remaining claims would go forward under the Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367. Order [Dkt. No. 24], June 4, 2015. After the parties' cross-motions for partial

summary judgment were denied, see Order [Dkt. No. 138], Oct. 30, 2015, the action proceeded

to a jury trial. On the third and final day of trial and at the conclusion of the plaintiff's case, the

defendant's motion for judgment as a matter of law with respect to the intentional infliction of

emotional distress claim was granted. See Trial Tr. 560:20-566:12. The remaining three claims

went to the jury, which found that the defendant had assaulted the plaintiff and had violated Va.

Code Ann. § 8.01-42.1, but found that the defendant had not committed the alleged battery.

Verdict Form [Dkt. No. 184], Dec. 7, 2015. The jury awarded the plaintiff $100,000 in

compensatory damages and $250,000 in punitive damages. Id. at 2; see also Trial Tr. 733:19-

734:1.

The defendant subsequently filed the pending motion for a new trial or remittitur

pursuant to Federal Rule of Civil Procedure 59. Def.'s Rule 59 Mot. [Dkt. No. 188] ("Def.'s

Mot."), Jan. 5, 2016. In his opposition, the plaintiff argued that the defendant's motion was

improperly characterized as a Rule 59 motion rather than a Rule 60(b) motion because it focused

on purported jurisdictional defects. Mem. in Opp'n to Mot. for New Trial or Remittur [Dkt. No.

191] ("Pl.'s Opp'n") 2-3, Jan. 14, 2016. In response, the defendant requested that the

jurisdictional arguments be treated as if brought under Federal Rule of Civil Procedure 60. Def.'s

Mot. for Guidance & Direction [Dkt. No. 195] ("Mot. for Guidance") ¶ 6, Jan. 14, 2016. The

Court granted that request. Order [Dkt. No. 198], Jan. 15, 2016.

## II.    DISCUSSION

The defendant seeks a finding that the Court lacked original jurisdiction over the civil

action but, in the alternative, argues that the Court erred in exercising its discretion to maintain

the action and in two of its evidentiary rulings. The defendant also contends that the jury's

verdict violates the defendant's First Amendment rights and is out of proportion to the evidence

presented at trial. The plaintiff disputes all of these contentions and argues that the jurisdictional

decisions and the jury's verdict should be upheld.

### A. Rule 60

Federal Rule of Civil Procedure 60 provides that a

court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b). To prevail on a Rule 60(b) motion, a party must first "make a showing of

timeliness, a meritorious defense, a lack of unfair prejudice to the opposing party, and

exceptional circumstances" before he may "proceed to satisfy one or more of the rule's six

grounds for relief from judgment." Werner v. Carbo, 731 F.2d 204, 206-207 (4th Cir. 1984)

(citing Compton v. Alton Steamship Co., 608 F.2d 96, 102 (4th Cir. 1979)). If a movant seeks

relief from judgment based on Rule 60(b)(6), "any other reason that justifies relief," he must

demonstrate truly "extraordinary circumstances" not encompassed by the other five grounds for

relief and must show that his reason for seeking relief could not have been addressed on appeal

instead. Aikens v. Ingram, 652 F.3d 496, 500-01 (4th Cir. 2011) (quoting Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 863 n.11 (1988)) (internal quotation marks omitted).

Neither party addresses whether Dahlberg meets these standards or what grounds for relief he is asserting, but because defendant raised his subject-matter jurisdiction argument at the earliest opportunity, albeit in a cursory fashion, the Court will assume without deciding that he satisfies the threshold requirements for a Rule 60(b) inquiry. His argument regarding subject-matter jurisdiction most reasonably falls within the category of "any other reason that justifies relief." Because the Court will find that it had original jurisdiction in the first instance and did not err in exercising its discretion to maintain supplemental jurisdiction, defendant will be unable to show that the Court's exercise of jurisdiction constitutes "extraordinary circumstances" that merit relief from judgment.

### 1. **Original Jurisdiction**

Dahlberg first contends that the Court lacked jurisdiction to try this civil action because Count I, the only claim to raise a federal question, was defective on its face, thereby failing to provide a proper basis for the Court to exercise its supplemental jurisdiction over the remaining state law claims. Dahlberg further argues that even if the Court had original jurisdiction over the action, it erred in exercising supplemental jurisdiction over the state law claims after the federal claim was dismissed.

Dahlberg's contentions are unpersuasive, as he fails to demonstrate that the Court lacked original jurisdiction or was required to dismiss the state law claims. To resolve this issue, the first question to be answered is whether the complaint included a federal question on its face such that the Court had original jurisdiction. Defendant provides no direct authority on this issue; rather, he quotes the Fourth Circuit's holding that courts have discretion to exercise supplemental

6

jurisdiction over state law claims "so long as one claim in an action present[s] a federal question on the face of the well-pleaded complaint." See Def.'s Reply to Pl.'s Opp'n to the Def.'s Rule 59 Mot. [Dkt. No. 2013] ("Def.'s Reply") 3 (quoting ESAB Grp., Inc. v. Zurich Ins., PLC, 685 F.3d 376, 394 (4th Cir. 2012)) (internal quotation marks omitted), Jan. 19, 2016. Defendant also does not provide any authority discussing the criteria for determining when a complaint fails to adequately present a federal question, and plaintiff's response to defendant's motion focuses on the question of whether the Court erred in exercising its discretion, rather than on the question of whether it had such discretion in the first instance. In the absence of authority provided by the parties, the Court has conducted its own inquiry into this issue.

The relevant authority demonstrates that the Court had original jurisdiction over this action because plaintiff's well-pleaded complaint presented a federal question on its face. Pursuant to the "substantiality doctrine," see Hagans v. Lavine, 415 U.S. 528, 538 (1974), a "federal claim must have substance sufficient to confer subject matter jurisdiction on the court." See United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966); see also Ex parte Poresky, 290 U.S. 30, 31 (1933) ("In the absence of diversity of citizenship, it is essential to jurisdiction that a substantial federal question should be presented."); Garraghty v. Va. Ret. Sys., 200 F. App'x 209, 211 (4th Cir. 2006) ("The existence of subject matter jurisdiction depends upon the assertion of a substantial claim."); Lovern v. Edwards, 190 F.3d 648, 654 (4th Cir. 1999) ("The mere assertion of a federal claim is not sufficient;" rather, the claim must be substantial.). In other words, in the absence of diversity jurisdiction, a court may exercise supplemental jurisdiction over a state law claim only if the federal claim is sufficiently substantial to confer original jurisdiction on the court.

"Constitutional insubstantiality for this purpose has been equated with such concepts as essentially fictitious, wholly insubstantial, obviously frivolous, and obviously without merit." Hagans, 415 U.S. at 537 (internal citations and quotation marks omitted); see also Garraghty, 200 F. App'x at 211-12. Moreover, previous decisions that make claims "of doubtful or questionable merit do not render them insubstantial;" rather, to make a claim constitutionally insubstantial such decisions must "inescapably render the claims frivolous." Id. at 537-38; see also E. Band of Cherokee Indians v. Donovan, 739 F.2d 153, 159 (4th Cir. 1984) ("[A] complaint alleging constitutional violations should be dismissed for lack of subject matter jurisdiction only where the constitutional allegations are wholly insubstantial or without merit, or foreclosed by prior cases which have settled the question."). This doctrine is particularly important in situations "where a wholly frivolous federal claim serves as a pretext to allow a state law issue, the real focus of the claim, to be litigated in the federal system." Davis v. Pak, 856 F.2d 648, 651 (4th Cir. 1988).

Accordingly, "this insubstantiality threshold is a difficult one to meet." Id. In this vein, the Fourth Circuit has confirmed that even "[c]ases which are doubtful on the merits," including cases that "cannot survive a Fed. R. Civ. P. 12(b)(6) motion for failure to state a claim," are nonetheless "substantial enough to support federal jurisdiction." Id.; see also Bell v. Hood, 327 U.S. 678, 682 (1946) ("Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy."). Although defendant here raised his motion to dismiss in part under Federal Rule of Civil Procedure 12(b)(1) for "lack of subject-matter jurisdiction," both his and plaintiff's arguments regarding the motion almost exclusively addressed the question of whether the complaint failed "to state a claim upon which relief can be

8

granted" pursuant to Federal Rule of Civil Procedure 12(b)(6), and it was on those grounds that

the Court granted the defendant's motion to dismiss.[2]

The handful of Fourth Circuit decisions addressing the criteria for determining

insubstantiality demonstrate that the federal claim asserted in the instant action was sufficiently

substantial to support federal jurisdiction even though it was dismissed based on defendant's

Rule 12(b)(6) arguments. For example, in Davis v. Pak, 856 F.2d 648 (4th Cir. 1988), the Fourth

Circuit explained the important distinction "between dismissing a weak federal claim via Fed. R.

Civ. P. 12(b)(6) or . . . dismissing it for lack of jurisdiction" when it ruled that the plaintiff's due

process claim was insubstantial because the admitted facts of the case showed that plaintiff had

been given both notice of the charges against her and an opportunity to be heard. Id. at 651-52.

Based on these undisputed facts and a previous Fourth Circuit ruling that the procedures at issue

were constitutional, the court determined that the plaintiff received all the process she was due

and characterized the conclusion that her due process claims failed for insubstantiality as

"unimpeachable." Id. at 652. Accordingly, dismissing a complaint because it fails "to state a

claim upon which relief can be granted" does not demonstrate insubstantiality, unlike dismissing

---

[2] Additionally, although defendant stated that his motion to dismiss was brought pursuant to both
Rule 12(b)(1) and Rule 12(b)(6), his supporting memorandum only discussed the standard of
review under Rule 12(b)(6), further indicating defendant's almost exclusive focus on that aspect
of his motion. Def.'s Mot. to Dismiss Br. 1-3.The two standards are distinct and carry
significantly different implications with respect to substantiality, as discussed above. A Rule
12(b)(6) inquiry examines whether a complaint has "set forth sufficient factual matter, accepted
as true, to 'state a claim for relief that is plausible on its face,'" Ashcroft v. Iqbal, 556 U.S. 662,
678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 547 (2007)); however, on a
Rule 12(b)(1) motion a court must determine whether "plaintiff's allegations, standing alone and
taken as true plead jurisdiction and a meritorious cause of action." Allianz Ins. Co. of Canada v.
Cho Yang Shipping Co., Ltd., 131 F.Supp.2d 787, 789 (E.D.Va. 2000) (quoting Dickey v.
Greene, 729 F.2d 957, 958 (4th Cir.1984)) (internal quotation marks and alteration omitted).

a claim pursuant to Federal Rule of Civil Procedure 12(b)(1) for "lack of subject-matter jurisdiction."

Similarly, in its unpublished decision in Garraghty v. Virginia Retirement System, 200 F. App'x 209 (4th Cir. 2006), the court found that the plaintiff's due process claim against the Commonwealth of Virginia was not substantial because the "record amply demonstrate[d] that [the plaintiff] received both" notice and an opportunity for hearing and that "stripped of the alleged due process violation, it [was] evident" that the plaintiff only sought "federal consideration of a state law issue." Id. at 211-12. In a different action addressing a due process claim, this time that a legislative bill unconstitutionally removed the plaintiff from her government position, the Fourth Circuit found that because the Supreme Court had "ruled time and time again that, under the federal constitution, a legislative body . . . has the unfettered authority to create, alter and abolish such positions," the plaintiff's claim clearly did not raise a substantial federal question. Goldsmith v. Mayor & City Council of Baltimore, 845 F.2d 61, 65 (4th Cir. 1988).

The Fourth Circuit has found insubstantiality in other contexts where relevant case law foreclosed the purported federal claims. For example, in Eastern Band of Cherokee Indians v. Donovan, 739 F.2d 153 (4th Cir. 1984), the court found insubstantial plaintiff's claim that the defendant forced it to waive a "meritorious defense," ruling that "prior case law" had established that the defense was not in fact meritorious. Id. at 159. In Lovern v. Edwards, 190 F.3d 648 (4th Cir. 1999), the Fourth Circuit addressed a plaintiff's claims that the defendant school officials violated his First and Fourteenth Amendment rights by barring his entry onto school property after he engaged in "verbal abuse and threatening behavior towards school officials." Id. at 655 (internal quotation marks omitted). The court found that the school "did not seek to affect [the

plaintiff's] conduct except on [school] property," referred to precedent establishing that school administrators have authority to control access to and behavior on school property, and determined that the plaintiff's "assertions that school administrators must provide him with boundless access to school property" were "plainly insubstantial and entirely frivolous." Id. at 655-56. The court echoed the district court's sentiment that the action was "a monument to what ought not to be in federal court" and found "application of the substantiality doctrine" to be "particularly appropriate." Id. at 656 (internal quotation marks omitted). These decisions demonstrate instances where a claim is clearly foreclosed by controlling precedent and is therefore insubstantial for the purposes of jurisdiction.

In the instant action, plaintiff's § 1981 claim was not "obviously without merit," was not clearly foreclosed by precedent, and was not an attempt to "frame[] a pretextual federal issue solely for the purpose of having a state-law claim adjudicated in the federal system." See Lovern, 190 F.3d at 654-55. Although the Court ultimately rejected plaintiff's claim on a Rule 12(b)(6) motion, it was not a plainly insubstantial one.

First, unlike some of the due process claims rejected by the Fourth Circuit as insubstantial, the essential elements of plaintiff's § 1981 claim were disputed by defendant on both factual and legal bases. Rather than focus on arguments that plaintiff's complaint should be dismissed pursuant to Rule 12(b)(1), defendant relied on the transcript of the defendant's rant and focused his argument on the § 1981 claim's failure under Rule 12(b)(6) to "state a plausible claim that the defendant intentionally discriminated on the basis of race." Def.'s Mot. to Dismiss Br. 5. The plaintiff responded that the allegations that he speaks English with an Arabic accent because he was born and raised in Somalia, that Dahlberg asked where he was born, and that Dahlberg's assault and battery were motivated by Salim's status as both an Arab and a Muslim

11

supported a § 1981 claim. Pl.'s Mot. to Dismiss Opp'n 1. He also argued that "common experience suggests…and discovery may confirm, that Mr. Dahlberg bears as much hostility, if not more, towards Arabs, who constituted 100% of the persons responsible for the 9/11 attacks about which Mr. Dahlberg ranted, rather that [sic] merely 'Muslims.'" Id. at 2. In Dahlberg's reply brief, he argued that "the question in the case at bar is whether the plaintiff has pleaded facts to show that the alleged discriminatory acts in this case were actually based on race" and contended that plaintiff's allegations were too conclusory and his argument too speculative to establish a valid claim under § 1981. Def.'s Reply to Pl.'s Opp'n to the Mot. to Dismiss Pursuant to Rules 12(b)(6) and 12(b)(1) [Dkt. No. 11] ("Def.'s Mot. to Dismiss Reply") 2, May 18, 2015.

The parties' dispute over the inferences to be drawn from the facts alleged in the complaint demonstrates not only that defendant failed to adequately present a substantiality argument (and potentially waived such an argument) but also that the essential facts were not clearly established and the full extent of defendant's animus not yet determined. Accordingly, the instant action differs from cases like Davis v. Pak, where the undisputed facts demonstrated that plaintiff had received notice and an opportunity for hearing and precedent established that defendant's conduct was constitutional. See Davis, 856 F.2d at 651-52. Here, because it was unclear at the pleading stage what defendant's motivation was for his actions, and the parties vigorously argued over the sufficiency of plaintiff's allegations, the plaintiff's § 1981 claim was not insubstantial. The Court's decision to dismiss plaintiff's § 1981 claim, made after careful consideration of the pleadings and oral argument from both parties, consequently highlights the difference between "dismissing a weak federal claim via Fed. R. Civ. P. 12(b)(6)" rather than "dismissing it for lack of jurisdiction." See id. at 651. This dismissal shows that plaintiff's claim was dubious on the merits, but not that it was wholly without merit or entirely frivolous.

Furthermore, no clear precedent foreclosed plaintiff's claim. Salim argued that not only were his allegations sufficient to raise a plausible claim of race or national origin discrimination, but that there was established precedent in other types of discrimination cases in which religious discrimination and racial discrimination were found indistinguishable, especially with respect to Muslims of Middle Eastern descent in the post-9/11 era. Pl.'s Mot. to Dismiss Opp'n 2-5. For example, plaintiff relied on Sasannejad v. University of Rochester, 329 F. Supp. 2d 385 (W.D.N.Y. 2004), in which the court determined that although "[a] claim based on national origin discrimination is theoretically different from a claim based on religious or racial discrimination," "in certain circumstances, the two claims may be so interrelated as to be indistinguishable." Id. at 391. The court stated that "the religious demography of Iran," the plaintiff's country of origin, was "important" because it "is an Islamic Republic and ninety-eight percent of its population is Muslim," meaning that "the line between discrimination based on Iranian national origin and the Islamic religion" was "sufficiently blurred" such that the plaintiff's EEOC claim for national origin discrimination could also encompass a religious discrimination claim.[3] Id.

Similarly, the court in United States EEOC v. NCL America, 535 F. Supp. 2d 1149 (D. Haw. 2008), in addressing the Yemeni plaintiffs' claims that they were discriminated against on the basis of their Muslim religion, remarked that "courts are beginning to recognize the overlap between religion and national origin," just as they have previously recognized the overlap between race and national origin. Id. at 1163. In NCL America, the court found that even though the executive who had made a challenged employment decision "had no knowledge of [the

---

[3] The court "assume[d], without deciding," that the plaintiff's religious discrimination and national original discrimination claims were "reasonably related" such that plaintiff could be deemed to have exhausted his administrative remedies. Id.

plaintiffs'] actual religion, there [was] at least a question of fact as to whether [he] inferred their religion based on their Yemeni origin." Id. at 1164. The court further stated that "[i]n this post-September 11 world, national origin and religion have often become conflated in media reports, especially with regard to issues of terrorism." Id. Here, plaintiff asked the Court to draw the inference from Dahlberg's statements and conduct that he had conflated Salim's race, national origin, and religion during his rant against Muslim terrorists. Plaintiff had alleged that Dahlberg heard Salim's foreign accent and asked him where he came from, and Salim told Dahlberg he was from Somalia, before Dahlberg began his tirade against Muslims. Plaintiff argued that one could infer from those allegations that Dahlberg knew or inferred Salim's race and conflated that race with his Muslim religion.

Defendant argued that plaintiff's authority regarding discriminatory overlap was irrelevant because these cases primarily dealt with employment discrimination suits in which far more protected classes are recognized. Def.'s Mot. to Dismiss Reply 2-3. In making that argument, defendant missed the key point plaintiff was raising, which was the proposition that race, national origin, and religion can overlap in ways that make discrimination on the basis of one indistinguishable from discrimination on the basis of the other, a result which at least warranted close scrutiny of the case law and evidence to determine if race or national origin played a role in defendant's conduct. See Pl.'s Mot. to Dismiss Opp'n 3. Although the Court ultimately rejected plaintiff's argument after considering the entire transcript of Dahlberg's rant, the plaintiff's § 1981 claim was not wholly meritless and was therefore sufficient to support federal question jurisdiction.

14

### 2. **Supplemental Jurisdiction**

Having determined that plaintiff's § 1981 claim conferred original jurisdiction, the second question is whether the decision to retain the pendent state law claims after dismissing the § 1981 claim was a valid exercise of discretion. 28 U.S.C. § 1367(a) provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." This provision constitutes "a broad grant of supplemental jurisdiction over other claims within the same case or controversy, as long as the action is one in which the district courts would have original jurisdiction." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 558 (2005); see also ESAB Grp., Inc., 685 F.3d at 394.

In determining whether to exercise supplemental jurisdiction, a district court should undergo a flexible balancing analysis in which it "should consider and weigh . . . the values of judicial economy, convenience, fairness, and comity." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988); see also Gibbs, 383 U.S. at 726 (stating that if those factors "are not present a federal court should hesitate to exercise jurisdiction over state claims"). Although the Supreme Court has found that "[w]hen the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction," id. (footnote omitted), it has also clarified that "this statement [regarding early dismissal of federal claims] does not establish a mandatory rule to be applied inflexibly in all cases," id. at 350 n.7 (citing Rosado v. Wyman, 397 U.S. 397, 403-05 (1970)). Instead, "trial courts enjoy wide latitude" in making this determination, Shanaghan v. Cahill, 58 F.3d 106, 110

(4th Cir. 1995), and are permitted to deal with "pendent claims in the manner that most sensibly accommodates a range of concerns and values." Cohill, 484 U.S. at 350. Accordingly, even when the federal claims that provide the basis for original jurisdiction are dismissed early in the litigation, a court may, but is not required to, dismiss the pendent state claims. Moreover, the court's decision to exercise supplemental jurisdiction is "purely discretionary" and does not constitute a jurisdictional issue. See Carlsbad Tech., Inc. v. HIF Bio, Inc., 556 U.S. 635, 639-40 (2009).

 This precedent demonstrates that although it was within the Court's discretion to dismiss the state claims in this action after dismissing the § 1981 claim, it was not required to do so and was permitted to make the "purely discretionary" decision that the relevant interests favored its exercise of supplemental jurisdiction. "Among the factors that inform this discretionary determination are convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." Cahill, 58 F.3d at 110. Two of those factors weighed strongly in favor of exercising supplemental jurisdiction over the state claims: judicial economy and federal interest. Although the dismissal of the § 1981 claim occurred relatively early in the litigation, the Court had already invested time to issue a scheduling order to permit discovery to proceed, Order [Dkt. No. 8], May 7, 2015, and the parties had worked together to develop and submit to the Court for review a discovery plan, Discovery Plan [Dkt. No. 21], May 29, 2015; see also Rule 16(B) Scheduling Order [Dkt. No. 22], June 1, 2015. The Court had also invested resources in examining the merits of the defendant's motion to dismiss and hearing oral argument. Accordingly, the interests of judicial economy weighed in favor of exercising supplemental jurisdiction over the state law claims.

Furthermore, although defendant argues that issues of comity mandated remand to state court,[4] plaintiff's claims implicated bedrock federal concerns. Specifically, the state law claims in this action involved allegations of discrimination, harassment, intimidation, and violence related to plaintiff's status as a Muslim. As the body of federal civil rights legislation demonstrates, eliminating discrimination against minorities and against persons on the basis of their religion are significant federal interests. See, e.g., Johnson v. Ry. Express Agency, Inc., 421 U.S. 454, 457-58 (1975) (describing Congress' enactment of Title VII of the Civil Rights Act of 1964 as intended "to assure equality of employment opportunities by eliminating those practices and devices that discriminate on the basis of race, color, religion, sex, or national origin" (quoting Alexander v. Gardner-Denver Co., 415 U.S. 36, 44 (1974)) (internal quotation marks omitted)).

Defendant argues that considerations of fairness required remanding the action, focusing on the procedural distinction between Virginia courts, where juries hear and decide any attorneys' fees claims, in contrast to federal courts, where the presiding judge decides the fees issue. Def.'s Br. 5-6. He argues that because the jury did not hear evidence of attorneys' fees, the jury awarded a significant amount of punitive damages without understanding that the award may bankrupt defendant. Id.

---

[4] Defendant's comity argument rests in part on the speculative insinuation that "this court accepted the suggestion that it should maintain [the state law] claims in federal court because of a lack of confidence in the Virginia trial courts" after the state declined to prosecute Dahlberg for his actions. Def.'s Mot. 5. A state prosecutor's decision whether to pursue criminal charges had no bearing on whether the related civil action should be heard by a state or a federal court. The Court limited the amount of evidence presented to the jury about the state criminal case, thereby demonstrating that the jury was not influenced either way by the state's handling of the matter and no issues of comity were implicated by having plaintiff's complaint resolved in federal court.

Defendant's fairness argument fails because after the § 1981 claim was dismissed, the

only basis for awarding attorneys' fees in this action was the Virginia civil rights statute, which

explicitly provides that "[a]ny aggrieved party who initiates and prevails in an action authorized

by this section shall be entitled to damages, including punitive damages, and in the discretion of

the court to an award of the cost of the litigation and reasonable attorneys' fees in an amount to

be fixed by the court." Va. Code Ann. § 8.01-42.1 (emphasis added). Defendant argued in a pre-

trial motion in limine that, despite the statute's clear statement that fees and costs may be

awarded "in the discretion of the court" and were "to be fixed by the court," Virginia law

required that a jury hear and decide on any request for fees under the statute. See Def.'s Mem.

Supporting His Mot. in Limine Regarding Attorney Fees [Dkt. No. 108] 2-4, Oct. 14, 2015. The

authority defendant provided in support of his argument, however, demonstrated that in

Virginias, attorneys' fees must be decided by a jury "[a]bsent agreement of the parties with the

concurrence of the court, or pursuant to contract or statute with specific provisions." Id. at 3

(quoting Lee v. Mulford, 611 S.E.2d 349, 352 (Va. 2005)) (internal quotation marks and

emphasis omitted). As the Court determined at the motion in limine stage, see Hr'g Tr. [Dkt. No.

147] 4:25-11, Oct. 30, 2016, the explicit reference to "the court" in Va. Code Ann. § 8.01-42.1

demonstrates that the statute is one "with specific provisions" requiring a trial court, rather than a

jury, to determine an award of fees and costs to a plaintiff who has prevailed under this statute.

There is no Virginia case law to the contrary,[5] and the only reported decision in which

Va. Code Ann. § 8.01-42.1 was invoked to award attorneys' fees occurred in a federal court

action. See Johnson v. Hugo's Skateway, 974 F.2d 1408, 1418-19 (4th Cir. 1992). That action

---

[5] Defendant also contends that a Virginia court should have been allowed to decide this issue due to the lack of relevant authority; however, this argument does not overcome the weight of the other factors in favor of maintaining supplemental jurisdiction.

also involved a federal claim under 42 U.S.C. § 1983, but the court stated that Va. Code Ann. § 8.01-42.1 "gives to the trial court discretion to make 'an award of the cost of the litigation and reasonable attorneys' fees in an amount to be fixed by the court'" and remanded the "entire attorneys [sic] fees issue to the district court for further consideration." Id. (quoting Va. Code Ann. § 8.01-42.1).

Additionally, plaintiff accurately stated in his opposition to defendant's motion in limine, Mem. in Opp'n to Def.'s Mots. in Limine [Dkt. No. 124] 7-8, Oct. 21, 2015, that Va. Code Ann. § 8.01-42.1 is almost identical to the fee-shifting statute for federal civil rights actions, which provides that "[i]n any action or proceeding to enforce a [civil rights] provision.... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). Pursuant to this provision, the court, not the jury, determines a party's "entitlement to fees" in "an inquiry separate from the decision of the merits—an inquiry that cannot even commence until one party has 'prevailed.'" White v. N.H. Dep't of Emp't Sec., 455 U.S. 445, 451-52 (1982). In the absence of contrary authority and in light of its federal analog, the clear language of the Virginia statute controls. Therefore, an award of fees and costs would have been decided by the trial court regardless of whether this action was heard in federal or state court, and no issues of fairness demonstrate that the Court erred in exercising supplemental jurisdiction.

Because the Court had discretion to exercise supplemental jurisdiction over the state law claims and did not err in choosing to exercise that discretion, the defendant's jurisdictional arguments provide no basis on which to grant the defendant relief from the judgment under Rule 60(b).

## B. **Rule 59 Arguments**

When considering a motion brought pursuant to Fed. R. Civ. P. 59, a district court may "grant a new trial only if (1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice." Bennett v. Fairfax Cnty., 432 F. Supp. 2d 596, 599 (E.D. Va. 2006) (quoting Lovell v. BBNT Solutions, LLC, 295 F. Supp. 2d 611, 618 (E.D. Va. 2003)) (internal quotation marks omitted). This determination "is entrusted to the sound discretion of the district court," and the court is required to "weigh the evidence and consider the credibility of the witnesses," id.; however, the court "must not set aside a verdict as either inadequate or excessive merely because the district court would have acted differently if it had been the trier of fact." Stebbins v. Clark, 5 F. App'x 196, 202 (4th Cir. 2001).

Furthermore, a district court sitting in diversity must apply state law standards in determining whether a jury verdict was against the clear weight of the evidence. Bennett v. R&L Carriers Shared Servs., LLC, 744 F. Supp. 2d 494, 532 (E.D. Va. 2010) (citing Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 438-39 (1996)). Under Virginia law, a jury verdict may be overturned only if it "is so excessive as to shock the conscience of the court and to create the impression that the jury has been influenced by passion, corruption, or prejudice, or has misconceived or misunderstood the facts or the law, or if the award is so out of proportion to the injuries suffered to suggest that it is not the product of a fair and impartial decision." Id. (quoting Rutherford v. Zearfoss, 272 S.E. 2d 225, 227-28 (Va. 1980)) (internal quotation marks omitted).

### 1. **Size of the Verdict**

The defendant first argues that the total verdict of $350,000 should shock the conscience of the Court because the plaintiff did not present any evidence of special damages aside from a

broken pair of eyeglasses and because the only injury to the plaintiff consisted of experiencing

"approximately six minutes of bad language and expression of offensive opinions, after which

Mr. Dahlberg simply walked away." Def.'s Mot. 6-7.[6] The defendant also repeats the causation

argument he made at trial, see Trial Tr. 674:18-675:2, asserting that the plaintiff did not present

any evidence of lost income, emotional distress, therapy, or treatment "caused solely by the

encounter" with Dahlberg. Def.'s Mot. 7. The plaintiff responds that he presented unrebutted

expert testimony demonstrating that the encounter caused him to suffer Post-Traumatic Stress

Disorder ("PTSD"), and that Dahlberg failed to have Salim examined by his own mental health

expert to rebut that evidence. Pl.'s Opp'n 6.

 None of Dahlberg's arguments demonstrates that the jury's decision was the product of

passion or prejudice or based on a misunderstanding of the facts or law. As the plaintiff argues,

id. at 5, he did not base his request for damages on medical bills or on a $500 pair of eyeglasses,

but instead focused on the emotional distress he suffered during and after the incident. Plaintiff's

counsel argued in closing that damages for physical injury were "perhaps the smallest part" of

the case and that the case was not "a contract case, where I can tell you the case is worth X

---

[6] The defendant contends that the plaintiff's arguments rely on evidence that was not presented
to the jury and that the evidence of the plaintiff's emotional distress consists only of plaintiff's
testimony and the testimony of his mental health expert, neither of which should be credited due
to plaintiff's admitted perjury and the expert's admission that plaintiff lied to her about key parts
of his past but that she nonetheless relied on what he told her as the truth. Def.'s Reply 7-8; see
also Trial Tr. 551:17-552:20. The plaintiff originally alleged that he served in Iraq as a member
of the United States military, and he testified to that effect during his sworn deposition. Compl.
¶¶ 1-2; Trial Tr. 430:3-5. After obtaining the plaintiff's military records, the defendant learned
that this assertion was untrue. Trial Tr. 463:13-464:2. Although plaintiff had served honorably in
the U.S. military and had worked for a military contractor, his work overseas was as a translator
at Guantanamo and in Djibouti. Trial Tr. 20:20-24, 464:19-22. The plaintiff admitted during trial
that he had lied about serving in Iraq to make himself feel more like "a man" and to combat the
anxiety and depression he was experiencing after the incident with the defendant. See Trial Tr.
429:4-430:23.

dollars," but that the jury could award damages for Salim's loss of his sense of security after

having come to the country as a refugee[7] and could "respond to [Salim's] being told that he's a

piece of sh*t Muslim." Trial Tr. 669:20-672:6. Accordingly, plaintiff premised his damages

request on emotional distress resulting from the encounter with Dahlberg, an encounter that

defendant downplays but one which the jury clearly viewed as serious and harmful despite its

brief duration.

Furthermore, the jury was fully aware of the false statements Salim made in responding

to discovery and to his therapist, Saara Amri. See Trial Tr. 5354:5-11, 553:24-554:8. They also

heard his explanation of why he was not truthful. Trial Tr. 429:4-430:23. It was within the jury's

province to accept or reject plaintiff's testimony as to his mental health, and they obviously

chose to credit his testimony that he was profoundly affected by the incident as well as his

therapist's diagnosis that Salim suffered from PTSD caused by the incident. Specifically, Salim

testified that he experienced "anxiety…frustration, distress, stress, [and] depression," was unable

to work or feed his family, often felt scared and paranoid that he was being followed, and

ultimately sought mental health counseling. Trial Tr. 424:14-425:23. His therapist Ms. Amri,

who qualified as an expert witness,[8] testified that she diagnosed plaintiff with PTSD caused by

the April 2013 assault. Trial Tr. 548:16-549:2. She also testified that individuals such as the

plaintiff who have experienced previous trauma may be more susceptible to again developing

---

[7] Plaintiff received asylum in the United States after fleeing Somalia. Trial Tr. 333:23-341:8.
Plaintiff testified that he was a member of a minority clan in Somalia that was persecuted during
the civil war in the 1990's. Trial Tr. 328:12-331:13. Plaintiff's brother, uncle, and stepmother
were killed during the conflict, his ex-wife was raped, and plaintiff spent several years in a labor
camp "working as a slave" and enduring torture and beatings. Trial Tr. 331:24-332:17.

[8] Specifically, the Court accepted Ms. Amri "as an expert in the area of mental health counseling
for those who have claims of experienced trauma, with a specialty in working with Muslim and
Arabic-speaking persons." Trial Tr. 541:21-24.

PTSD "if they are exposed to another traumatic event, particularly once they've established safety and they've kind of developed a sense of stability." Trial Tr. 549:17-550:2. Additionally, the jury heard testimony that the Somali-American community responded negatively towards Salim in the aftermath of incident, Trial Tr. 420:15-421:1, and heard argument by counsel from both sides regarding the import of that evidence. See Trial Tr. 670:19-671:17; Trial Tr. 684:6-22.

As the jury was instructed, Trial Tr. 696:18-697:2, and as Dahlberg's counsel emphasized in closing argument, Trial Tr. 679:21-680:6, Salim's admission of perjury allowed them to distrust his testimony and to reject it either in part or in its entirety, but it also did not require that they distrust it in part or in total. The jury's verdict demonstrates that it permissibly trusted at least part of Salim's testimony and credited the other evidence of plaintiff's damages. The jury was also instructed on causation, Trial Tr. 703:23-704:5, and reasonably found, in line with Ms. Amri's testimony, that at least some of Salim's emotional distress was proximately caused by Dahlberg's conduct.

Moreover, Dahlberg did not present his own mental health expert or any contradictory evidence undermining or rebutting plaintiff's evidence of mental health problems and emotional distress resulting from the incident with Dahlberg. Accordingly, the jury was presented with unrebutted evidence of emotional distress suffered by the plaintiff as a result of Dahlberg's conduct, from which it could reasonably award $100,000 in compensatory damages.

Although neither party focuses extensively on the punitive damages award, the jury had before it the evidence of the verbal assault committed by Dahlberg, evidence of the impact the subsequent publicity about the incident had on both Salim and on Dahlberg's family, and evidence of Dahlberg's finances. Namely, the jury watched the video of the cab ride, Trial Tr. 37:16-49:22, and listened to both the plaintiff's and the defendant's testimony, Trial Tr. 110:22-

23, 327:1-6, as well as to Dahlberg's wife's testimony about the negative impact on her family.

Trial Tr. 103:25-104:10. It also heard Dahlberg's testimony that he made $500,000 in 2014 but

was likely to make less than $200,000 in 2015. Trial Tr. 171:20-172:2. The $250,000 in punitive

damages award was reasonably attuned to that evidence and was not so excessive as to shock the

conscience. Therefore, the jury verdict will not be overturned or remitted.

### 2. First Amendment Argument

Dahlberg argues that the jury's verdict violates his First Amendment right to free

expression. As the plaintiff correctly asserts, Pl.'s Opp'n 8, Dahlberg has waived this argument

by failing to raise it at any previous stage of the proceedings. Dahlberg contends that this defense

is not waived because the case originally included a claim for battery, conduct that is not

protected by the First Amendment. He further argues that the jury's finding that no battery

occurred means that the defendant is being punished only for his bad speech, which was

unaccompanied by any "overt threatening act," and therefore that his First Amendment rights

have been violated. Def.'s Reply 9.

Defendant's argument rests on a mischaracterization of the law of assault and the scope

of the First Amendment. As the jury was instructed, assault involves "an intentional threatening

act by the defendant that put the plaintiff in reasonable fear of imminent physical injury." Trial

Tr. 700:18-22. This cause of action by necessity involves "an intentional threatening act,"

meaning that defendant is being punished not only for bad speech but for bad conduct. Defendant

was found liable not just for assault but also for violating Va. Code Ann. § 8.01-42.1, which

required plaintiff to prove that he was subjected to intimidation, harassment, or violence by the

defendant. In reaching its decision on these two claims, the jury had for consideration the

recording, which showed some of the defendant's body language, and they were able to hear the

24

volume and tone of defendant's voice, in addition to hearing what he said during the cab ride—

all powerful evidence supporting a finding that defendant put plaintiff in fear of injury and

intimidated or harassed him based on his religion. Plaintiff was sufficiently upset by defendant's

conduct to have immediately called 911 for police assistance, and the jury heard that evidence.

See Trial Tr. 51:24:58:11. Accordingly, the assault and Virginia Code violations for which

defendant was found liable necessarily involved a finding of harmful or intimidating conduct by

defendant, thereby defeating his First Amendment argument.

Not only do these causes of action involve more than mere speech, the speech involved in

this litigation is not protected under the First Amendment. States are permitted to ban "true

threat[s]," which include "statements where the speaker means to communicate a serious

expression of an intent to commit an act of unlawful violence to a particular individual." See

Virginia v. Black, 538 U.S. 343, 359 (2003) (internal quotation marks omitted). "The speaker

need not actually intend to carry out the threat," as the bar "protects individuals from the fear of

violence" and "the possibility that the threatened violence will occur." Id. at 359-60 (quoting

R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 388 (1992)) (internal quotation marks omitted).

The Supreme Court has characterized "[i]ntimidation in the constitutionally proscribable sense of

the word [as] a type of true threat." Id. at 360. By finding defendant liable for assault and a

violation of § 8.01-42, the jury found that the defendant's statements and conduct during the cab

ride were intentionally threatening as well as intimidating or harassing. Accordingly, even if

defendant is being held liable only for his "speech," his speech was the kind of "true threat" that

the First Amendment does not protect.

Furthermore, defendant's First Amendment argument is contradicted by his arguments at

trial, as defendant consistently denied any real commitment to the opinions espoused during the

April 2013 cab ride. Instead, defendant attributed his statements to his drunken state, stating that he could not justify or explain what he said during the cab ride because he was too intoxicated to think clearly. See Trial Tr. 129:21-24 ("I'm not going to be able to stand here and justify why I said what I said and to give meaning to why I said what I said."); see also Trial Tr. 122:21-24 ("I will say that I was intoxicated, and I don't think I gave any thought, any real thought process to any intellectual conversation that I was going to have."). When asked why he made certain statements, defendant sometimes attempted to give reasons, but consistently stated that he did not actually believe those reasons were valid and instead attributed them to his inebriation. See Trial Tr. 133:10-12 ("I'm not justifying it. I'm just saying in the state that I was in, that's where I think I was coming from."). Similarly, defendant's counsel attempted to mitigate defendant's conduct during his closing argument, stating "Now, he's drunk. He's not very articulate." Trial Tr. 682: 10-13.

The defendant also confirmed that he was not "in any way proud" of his conduct and testified that he was "just absolutely mortified to have, have said those things and talked that way," Trial Tr. 166:11-16, particularly because he "[a]bsolutely" does not have any ill will towards Muslims and in fact has friends and clients that are Muslims. Trial Tr. 162:24-163:4; see also Trial Tr. 160:22 ("My language was abusive, disgusting."). Moreover, defendant apologized to plaintiff for his "outburst," stating that "the way that I talked to you was absolutely inexcusable, and you certainly have a right to your free speech and your opinion about jihad." Trial Tr. 128:21-24. The argument defendant now raises for the first time—that he was advocating for his personal political beliefs and that his speech was an honest expression of those beliefs—is inconsistent with defendant's testimony and theory from the beginning of this litigation.

26

### 3. Evidentiary Rulings

Defendant contests two evidentiary rulings made before and during trial. In a pretrial motion, plaintiff sought to exclude the videos of news broadcasts that involved interviews plaintiff gave following the April 2013 incident. Pl.'s Mem. in Supp. of Mot. in Limine [Dkt. No. 98] 11-13, Oct. 7, 2015. Plaintiff was accompanied by an attorney from the Council on American-Islamic Relations ("CAIR") during those broadcasts. Id. at 11. Defendant argues that the Court erred in ruling that the news broadcasts be redacted to exclude statements made by the CAIR attorney and by the news anchors, leaving just the plaintiff's statements. Defendant contends that these redacted portions of the videos were relevant on the issue of punitive damages because they demonstrated the way in which defendant had already "been punished significantly by the incident." Def.'s Mot. 12. Defendant's argument on this point is somewhat unclear, but it appears that he believes that the additional portions of the video would have demonstrated that "Mr. Dahlberg, his name, the name of his company, where he lives, and the most embarrassing portions of the 11 minute recording were broadcast nationwide in the manner most calculated to damage Mr. Dahlberg, his company…[and] his family's well-being, all as part of a publicity campaign," and would therefore have corroborated defendant's testimony that his income was declining and that he and his family had suffered in the wake of the incident. See Def.'s Reply 11.

Even if the exclusion of these portions of the video was error, it was not unfairly prejudicial to defendant, who was able to offer his own testimony about his declining income. See Trial Tr. 171:20-172:2. He also called his wife to testify about the negative impact the media coverage had on their family, thereby providing the jury with mitigation evidence. See Trial Tr. 103:25-104:10.

Defendant argues that the Court also erred in excluding a lengthy audio recording of an interview of plaintiff by police officers, which defendant characterizes as containing inconsistent and rehearsed statements by plaintiff. Defs.' Mot. 13-14. Although defendant moved the exhibit into evidence while cross-examining Officer Keith Allen, one of the police officers in the recording, no portion of the recording was played for the jury during trial. Trial Tr. 84:17-85:12. At the conclusion of the trial, defendant's counsel stated that the recording was among the exhibits that should be provided to the jury during deliberations, but the Court stated that because it was not played for the jury and was not "discussed in any detail," it would not be included. Trial Tr. 646:15-25.

Defendant attributes his failure to play the recording to the length of trial, arguing that the trial "was set by agreement for three days" but the plaintiff "took over two full days to present his case," meaning that defendant was forced to present his case "in less time than planned, and as a result did not specifically question witnesses about the statements made by the plaintiff in his recorded interview with the police." Def.'s Mot. 13. This argument is entirely without merit. The Court did not require the parties to finish the trial within a certain period of time and did not prohibit the defendant from presenting additional evidence. Instead, defendant chose to rest his case without presenting the recording to the jury, and he cannot now seek a new trial because of his decision or mistake.

Moreover, the exclusion of this recording was not unfairly prejudicial to the defendant. Defendant argues that this recording should not have been excluded because "[t]here is an important difference between the jury knowing in the abstract that the plaintiff may have been inaccurate in many of his statements to the police, and actually being able to hear the plaintiff recite some of the same inaccurate and false statements to the police." Id. at 14. The jury was

28

given evidence about what plaintiff said during his interview through the testimony of Officer Allen, one of the police officers present during the recorded interview. He testified at length about the contents of the interview. Trial Tr. 85:14-89:6. Moreover, defendant's counsel cross-examined plaintiff extensively about the interview, at times using the transcript of the interview for impeachment. Trial Tr. 516:15-519:25. Accordingly, the jury heard the relevant evidence related to the interview.

Furthermore, defense counsel chose not to call Detective Eric Stallings, the other officer present during the interview. Defendant also failed to attempt to play any portion of the recording, and explicitly declined to do so when moving it into evidence during the cross-examination of Officer Allen. Trial Tr. 84:17-85:12. The defendant may now feel that the jury would have been more receptive to that evidence had they heard the recording, but the decision not to play the recording is attributable to the defendant's litigation strategy and not to any error by the Court.

Accordingly, defendant's Rule 59 motion fails to establish any basis on which to grant him a new trial.

### III.    CONCLUSION

For the reasons stated above, the Defendant's Rule 59 Motion [Dkt. No. 188] will be denied by an appropriate Order to be issued with this Memorandum Opinion.

Entered this _16_ day of March, 2016.

_____ /s/ _____

Leonie M. Brinkema
United States District Judge

Alexandria, Virginia

29